Good morning, Your Honors. May it please the Court, my name is John Coffman, and I represent the appellant, Roger Barnett. Let me take a brief moment to introduce Mr. Barnett, who's in the back of the courtroom. And let me again thank the Court for accepting oral argument and bringing me to San Francisco. Let me begin by addressing some of the issues that I think the Court's most interested in. I was a little bit surprised, a couple of the issues concerned only matters of reviewing the record and determining whether what the facts are of the case, and I don't think we're here for oral argument on that. The issues that I want to discuss to the Court are some Federal issues, the issues of the gatekeeping function of the trial court, and if I have time, perhaps reviewing some of the issues concerning the punitive law or the punitive judgments in this case. If there's something that is more interesting to the Court, please interrupt, and I will focus my attention toward that. The first issue that I think is of interest is the gatekeeping function of the district court. In this case, we raise the issue of the psychologist or psychiatrist, Mr. Marchivansky, testifying to the Court on the basis of the MMPI, the Minnesota Multipersonality Inventory Test. It's a test that he gave to all of these plaintiffs in this case, 11 out of the 12 plaintiffs that showed up in Arizona. And on the basis of the test and some interviews, that's the basis for which the damage awards were given, both punitive and actual damages, emotional damages, those were the only damages in the case. We complained to the Court, we asked the Court, take some time, give us a hearing on this particular issue. There are a couple of things that went wrong here and why the test should not be considered without you exercising, you, the district court judge, exercising his gatekeeping role of keeping the evidence out. Did you take a deposition of the witness? Mr. Marchivansky, yes, a deposition was taken. And you got a rule, you got a report from him before you took the deposition? That's correct. Okay. It's a standard test. I mean, I've seen that Minnesota test, I'll say, a dozen times in litigation. That's right. But it's only validated for a specific population. Says who? Says Dr. Marchivansky. Okay. Well, that came in and you get that into evidence. And that's, doesn't that go to the weight rather than the admissibility of it? Yes. That goes to the weight, but what we were concerned about is the admissibility of it that never should have been presented to the jury. I mean, he says it's valid. You say it's not valid. The jury hears it and gives it as much or as little weight as it deems fit. And we heavily attacked Dr. Marchivansky. I understand, but that's why you didn't get hit with more bigger damages than you did, probably. But cross-examination, it served its function. But the problem is the district court didn't serve its function as the gatekeeper. There were a couple of reasons. Says who? That's what I'm saying. He says it's valid. The witness, the proponent says it's valid. You have evidence that it's not valid. Okay. But that's like every case. That's like every issue. You made your argument why it's not. They've got their argument why it is. The jury, you know, considers it. But in this case, it hadn't been validated in the Spanish version, and it hadn't been validated to the specific rural, Hispanic, low-educated population that you relied upon. What evidence do you have that you have to do that to invalidate the test? Well, we did have some substantial evidence. And you pointed that out to the jury, did you not? I know you made that argument. You made that argument. Yes. Yes, we did. We made that argument. They didn't buy it to the extent. Maybe they bought it and they, as Judge Sorbonne said, they cut the damages quite a bit because they bought it to some extent, but they didn't buy it wholeheartedly. Well, they didn't buy it in the case of the two Vicente women. They did buy it in the case of Velazquez and Vazquez, who they awarded no actual damages. But it then permitted them to go on and award punitive damages to each of these two women. Which brings up the interesting question as to whether or not this case in Arizona, Magna Cooper, is stale or still good law. Still good law, Your Honor. In Arizona, if there's no actual damages, there's no punitive damages. You don't even get to the due process. Well, I guess the basis of that is a due process analysis that without damages you don't get punitive because you're looking at something and you don't want somebody to punish simply bad behavior. And that's what's happening here. If there's no damages, then you're punishing bad behavior. Your argument, if I hear you correctly, is even if you lose on the compensatory, at the very least it's a reversal to the district court to dismiss the to vacate the award of punitive damages. To Velazquez and Vazquez, to the two women that were not awarded actual damages. I understand. And you're basing that on the viability of the Cooper case. Well, a long list of Arizona cases that say that. Let me tell you what I see is the problem with it. Judge Rall had a verdict form that specifically says that you can award punitive damages even if you award only nominal damages. And that went to the jury without any objection from your side. Why isn't that waived? Because we do not know the results until after the case. That's no answer. I mean, you've got a form that says you can do exactly what you're complaining about now, but you didn't complain about it then. Well, we didn't complain about it when the jury instructions, but we certainly complained about it after the trial. I know, after the damage was done. But the point is you have to object at the time. And their argument is if you don't object at the time, you waive it. And that's usually the rule. Well, it's the exception to that rule here is that we don't know that's what the jury's going to say. Well, you never know what the jury's going to say until they say it. I mean, that's like every case. I understand. But in this case, when the jury for verdicts are given to us and it's given blanks, we don't know how those blanks are. So just so I'm clear, your answer to their argument that you waived it by not objecting at the time is that you don't know what the jury's going to say. That's your answer to that. Well, yes, that's my answer, and that we immediately object to it. You made a motion. Yeah. Isn't that a better argument? You made a motion post-trial that the jury is contrary to Arizona law. Correct. Now, is that enough to cure the waiver, if there is a waiver? If there's a waiver, forget about the thing. But does your motion cure the, I'll call it the alleged waiver that the appellee would claim? I believe it does. We certainly brought it up to the Court almost immediately. Almost immediately after the verdicts were given, we talked to the judge, and then we filed motions immediately after. Yeah, but aren't you — well, as Judge Silver said, aren't you closing the barn door after the horses got out? Well, we don't see waiver, and I don't know if you're going to ever convince me about waiver, but we don't know what's going to go on in the future. The judge says, here's the verdict form, you can award actual damages, you can award nominal damages, and then if you feel appropriate, you can award punitive damages. And that's what the verdict form says. It doesn't say, you know, if you don't find punitive — if you don't find any damages, you can't award punitive damages. That's an instruction. Let me continue. Pardon? Let me continue. The other issue about the punitive damages is, and this was raised in their brief that we responded, is some kind of rational basis, the due process argument. We didn't raise it — although we raised it at trial and after trial, we didn't raise it in our opening brief. They raised it in their response brief, and we argued it in our reply brief. All the cases for due process claim that there must be some kind of rational basis, some kind of ratio between actual damages and punitive damages. That's the due process argument as opposed to the Arizona law argument. In this case, at least as to the Vasquez and Velazquez, there is no rational relationship. The final thing I want to discuss very briefly is the double damages for emotional distress. In this case, damages were awarded both emotional — the only damages claimed are emotional damages. All stemming from one single act. They get emotional damages of $7,500 under one theory of the tort, one tort theory, and $1,500 for the other theory of the tort. Those emotional damages are the same damages, and that's a double recovery, and that's not permitted. And we objected to that as soon — again, that's something that we didn't know about until the verdict came down, and we objected to that. If you have no other questions, let me reserve my final four minutes for review. Roberts. Thank you, Mr. Kaufman. Good morning. Good morning. May it please the Court, my name is David Urias, and I represent the plaintiff-appellees in this case. Appellant Barnett comes to this Court and requests that I step into the shoes of the jury and basically re-decide a lot of the issues that were vetted at trial. He provides no legitimate basis, however, to overturn the jury's verdict in this case. The jury heard compelling testimony of the distress that was endured by these plaintiff-appellees when they were held at gunpoint by Roger Barnett with a loaded .40-caliber handgun. The jury heard testimony about how he berated them with racial slurs and obscenities. The jury heard testimony about how he pointed his gun at the heads of each of these appellees, how one of them begged for her life — got down on her knees and begged for her life, and how he cursed at her and threatened her in response. The jury heard all this evidence and all the evidence that we — that Mr. Kaufman has talked about here on appeal. And after eight days of trial and after hearing the testimony of over 20 witnesses, they found in favor of the appellees on the counts of intentional infliction of emotional distress and the assault. Barnett now comes to this Court and he raises a number of issues on appeal that he has waived or that he has not preserved for appeal, none of which require the disturbance of the jury's verdict in this case. I'm very disturbed about the punitive damage award. The Cooper case seems to be — why couldn't we say that that's stale law, there's nothing else in Arizona since that date that substantiates it, and, I mean, why isn't it good law, that — and there's nothing that's overruled it? And we would be countencing a verdict, a judgment in this case, which is contrary to State law. No, Your Honor, that's not correct. Magma Copper v. Schuster, the case you're referring to, was a case from one division within the Court of Appeals that defined the definition of actual damages as excluding nominal damages. But it was never controlling law in Arizona because there were — there were conflicting decisions from other divisions of the Arizona Court of Appeals. So it's an open question under Arizona law. No, Your Honor, it was open until the case of Metasys Acquisition Corporation v. SDMS, a 2002 decision decided en banc by the Arizona Supreme Court. There, the Court expressly rejected the view that actual damages were limited to monetary damages, the same argument Barnett makes here. The question here is not whether the traditional rule — because we have no dispute with that. The traditional rule in Arizona is that actual damages must be awarded before there are punitive damages. The question is — Kennedy, did you say 2002? 2002 case, did you say? It is Metasys Acquisition Corporation v. S. Tell us the first word of it. Sure, Your Honor. It's M-E-D-A-S-Y-S. And it can be found at — M-E-D-A-S — sorry. Versus. M-E-D-A-S-Y-S, Metasys Acquisition Corporation v. S-D-M-S. And it can be found at 55 Pacific Third 763. That's a 2002 en banc decision by the Arizona Supreme Court. And the question there was whether actual — Was that here brief? It was in our Rule 28J letter that we submitted to the Court, Your Honor. We saw that. Okay. And basically what the Court did there, the question before the Court is what the definition of actual damages was for Arizona — in Arizona. And the argument being made by the defendants in that case was that if there was no compensatory damages, there could be no punitive damages. That case involved, I think, a request for injunctive relief where the plaintiff wasn't even asking for compensatory damages. And the Court there held they understood the traditional rule and they observed the traditional rule, but they were going to expand the definition of actual damages to include a variety of different types of harms, even those that were nonmonetary in — in nature, because what the — what the focus here is, is whether the position of — of the plaintiff has changed due to — due to the issue at trial. And in this case, we certainly have that. The jury found in favor of the apolies on the intentional infliction of emotional distress. But the bottom line is the jury gave, on the punitive damage of the two — the two awards we're talking about, no compensatory damages. They only gave punitive damages. And — and the — you know, I have a problem in this regard. If there are no compensatory damages and the jury just awards punitive damages, we have to have a situation where you cannot have an award of a — in a case where there is no case or controversy. And we don't award or even hear cases where there is no case or controversy. In other words, if someone does something bad, we don't get a jury to say, that's bad, we're going to give punitive damages. There's got to be a case or controversy. There's got to be some sort of — of civil or — or wrong before you can have a verdict. In this case, these two ladies received no compensatory damages, and we're going to countenance if we uphold this verdict. A punitive damages, which — which, in effect, says, we don't have a case or controversy before this Court, but we're going to say, bad, language, bad actions, and we're going to give a punitive damage award. Now, that smacks of there being no case or controversy, hearing a matter, and making a — a punitive — accountancing a punitive damage award when there was no controversy before the Court, except the — the bad behavior of the defendant. No, Your Honor. I think that there is no problem with the punitive damage award where there are only nominal damages. In Mendez v. San Bernardino, a Ninth Circuit case, that was exactly the issue under Federal law, is whether the nominal damages could stand or the punitive damages could stand. Well, the nominal damages are a stalking horse to allow punitive damages. So that's really — that's not compensatory. Nominal damages are not compensatory damages. Nominal damages are the — the stepping stone across this river of case or controversy. And it doesn't cut any — any ice here. You have a situation where there is no damages, and we're going to — there's no case or controversy if there's no damages. And we're going to punish someone. We're going to hear a case and punish people because we don't like the way they act. And perhaps rightfully so, but the — every constitution of every State I know says the courts do not hear and give advisory opinions that we don't like your language. Your Honor, I understand your point, but the question here is what does Arizona law allow. And in Mendez v. Acquisition — I'm sorry, Mendez v. S.D.E.M.S., the Arizona Supreme Court en banc decided that there was no problem with the award of punitive damages even when there were no non — when there were nonmonetary awards or even when there was equitable — equitable relief sought. I read your — I read your case. I don't think it's quite apropos. It's really not on all fours, is it? Would this matter before a case? Well, Your Honor, it's not on all fours simply because it did not directly address the nominal damages, but it directed a variety of different types of harms, exactly what the Supreme Court stated, and it was expanding, giving a very broad definition to actual damages. And I think that the case is on all fours on that point, and the cases that Mr. Barnett cites, too, are no longer and never were the controlling law in Arizona. Again, Your Honor, all of this has been waived. So the argument is kind of something that we're talking about in the event that they had deserved it. Well, you can't waive a case or controversy. It's before any court from us, any court, if there's no case or controversy, you have to — you have to remand and say, dismiss this or vacate that if there was no controversy, because we don't hear and give advisory opinions that we don't like the way your actions are or your words are, because it's a no-no. But in any event, why is the waiver — why is the waiver waived or cured by the motion post-trial to — to vacate the punitive damage award? Because that's not the law, Your Honor. The law is in Ninth Circuit that the — that the objection to the verdict form has to be made at the time or — before or at the time it's submitted to the jury. In this case, Barnett did not object to the form of the jury verdict form, which expressly allowed the jury to award punitive damages where either compensatory or nominal damages were awarded. He made no comment. He objected in no form. And that's exactly why the — what the district court brought up when Mr. Barnett made that argument after the jury's verdict form came back. There's no case that says that it's not cured with a motion post-trial to strike an improper charge to the jury, which awarded punitive damages, do you? Well, I think the case of Guy v. City of San Diego, which was a recent Ninth Circuit case that goes right to that issue. In that case, there was post-trial motions on that particular issue. What case is that? Is that in the brief, sir? It's also in the Rule 28J letter, Your Honor. Look at that one, too. It's not on — it's really not apropos. I disagree, Your Honor. I think that the issue in that case was whether or not the defendant could — could argue and complain of something that the jury did when they were instructed that they could do that in the verdict form. In that case, they were asked whether there was any nominal damages that would be awarded. And he — and he had later argued that they should have been asked whether any compensatory damages should have been awarded. And the — and the court of appeals here rightfully found that he waived that because he didn't object to the verdict form, and the jury was simply doing what they were instructed to do in the verdict form. And that's not only the issue with his nominal — with the nominal damages, punitive damages argument that they make here. It's also the issue with the apportionment of punitive damages argument that they make here, because the verdict forms expressly told the jury to apportion for compensatory damages, but did not allow them to apportion for punitive damages. He did not object to the verdict form at that time. Roberts. Let me ask you this. Assuming, just for the sake of discussion, that he's right about the punitive damage problem with the people who got the nominal damages, let's just assume for the sake of discussion he's correct about that and we forgive his waiver for whatever reason. That only affects Vasquez and Velazquez, right? That is correct, Your Honor. The punitive damage award of $20,000 for Vicente, she got two $20,000 award — punitive damages. No, Your Honor. She had one. She had — she had one award and her sister had one award. Medela's $20,000, that would still stand no matter — no matter what. There's no issue with those punitive damages. So we're only talking about a possible $20,000 reduction for those — for Vasquez and Velazquez. Is that right? Well, no. Sandoz Vasquez and Sandoz Velazquez received $10,000. That's what I mean, a total of $20,000. Yes, I'm sorry, Your Honor. That's correct. The other — the rest of this would stand, even if he's right about this. Even if he's right, but he's not, because Arizona law was quite clear on that issue and because he did waive it. And as I was saying, he waived the other issues, including the double recovery issue, and that is because the jury was carefully instructed by the judge that they could award on one verdict form for assault and the damages that went with that, and they could also separately award for the emotional distress that was endured as part of the IIED claim. And there was no objection, no comment made by Barnett at the time that those verdict forms were being discussed at trial or at the time they were submitted to the jury, and he did not bring up any issues with that until well after the verdict came down from the jury in his post-trial motions. As far as Dr. Machabonsky's testimony, I'm not sure how much the Court wants to hear on that.  The Court abused its discretion when it denied the motion in limine to exclude Dr. Machabonsky's testimony. Some of the issues that have now been raised here on appeal were not in the motion in limine to exclude Dr. Machabonsky's testimony, or they were very, you know, not noted in one sentence. The defendant here, Barnett, did not provide the district court any sufficient basis to exclude it. He complained of things like the psychologist being paid for his services. But he cited Sunolaw, which says that then you exclude the testimony of the expert. He cited that, exactly what we were talking about earlier, which is that Dr. Machabonsky conceded, he says, that the test had not been validated, the MMPI, for the Mexican national population. That was a mischaracterization of the deposition testimony, and the district court had that before it. What Dr. I think was his best argument on that. You comment on this, if you don't mind. The doctor sent the multiple choice test off to a computer place to be scored, came back, there was a question about the validity invalid in some respects. So instead of tossing out the test, he rescores it himself. Well, Your Honor, and Dr. Machabonsky was fully cross-examined on that issue, and he explained exactly why he did that, and that was because he was dealing with people who came from a different culture. And he then found that there were some issues where he thought handwriting the score or hand-scoring the test was actually more accurate. And he tested the computer score to begin with. Because he thought it would be more accurate to do it by hand, given the cultural differences with these people. It looks like he sent the thing off to be scored. He didn't like the way it came back, and so he changed the score. Absolutely not, Your Honor. Barnett raises an issue with a result from one part of one test for one of the athletes, and he complains of this fake bad result. And he interprets that to mean that somehow this plaintiff was faking her injuries, when in fact, that doesn't mean that is not at all what fake bad means, as Dr. Machabonsky testifies. What fake bad meant on that particular part of the test for that one athlete was that the subject was actually probably downplaying the emotional distress and trying to put or portray herself in a negative light. Those were the types of results he was getting. And he explained that besides the name of the result, which is fake bad, it doesn't necessarily mean that she was faking anything. Barnett presented no expert testimony to rebut that. He simply stated it out of his own opinion that fake bad must mean something bad, and therefore, the whole test had to be invalidated. And that was not the case. And neither was it the case that Dr. Machabonsky conceded that the test had not been validated for the Mexican population. What he stated in his deposition was that he didn't know. And he didn't know because it really doesn't matter. And there's no legal authority or medical authority that says that the MPI is somehow unreliable if it's not validated for each and every national population in the world. And that's what Dr. Machabonsky said. This was all hammered out before the jury in any event. That's true, Your Honor. It was a very long trial, and the cross-examination of Dr. Machabonsky went on for about a day, and all of these issues were fully vetted. The jury heard any issues that Barnett might have had with his testimony, and at the end, they credited Dr. Machabonsky's testimony. I would also like to briefly address the defense, self-defense instruction, if I may, because they made quite a big deal about it in their briefs. They didn't really even mention it today. He didn't mention it today, but if you want to hear anything on the self-defense, I can do that. It's in the briefs you've got, Your Honor. Thank you, Your Honor. I appreciate it. Thank you very much. Mr. Kaufman, you have four minutes left. Let me just respond to what I consider basically the whole nature of their case. When Mr. Urias came up here, he started with the first phrase that one of the women was sitting there at gunpoint begging for her life. That's completely false. In their brief, they quote on page 7 of the response brief, Adela Vicente, one of the women in the group, dropped to her knees and began to beg Appellant Barnett to let them go, something completely different from begging for her life. I just bring it up because their whole brief and their whole position is similar. That strikes you as a big difference? Pardon? That strikes you as a big difference? Yes. She wanted to go, so they could let her go. Somebody has a gun to your head and one person says, I beg for my life. They say, I beg you to let me go. Do you think that's a real big distinction? The let me go is, let me go into your country and you not hold me. Or let me go and live. I mean, that's another way you could interpret that. I'm just saying that it's just an inaccurate statement that pervades the appeal. What else have you got? I've got some more stuff. We have a letter of response to their letter. And we talked about Guy versus City of San Diego. And Guy centers upon the failure to expand the verdict form and not a verdict form that is contrary to law, as Justice Cowan pointed out in his questions. We also dealt with Medias versus Acquisition Corporation. To say that this is the case that stands for the proposition that no damage, you can award punitive without any damages is not being candid with the court. The case stands for the proposition that if you don't, in that case, they awarded equitable damages. But there were damages, maybe not monetary damages, but equitable damages that the jury or that the court awarded the defendant. And on that basis, they said, if you have damages, whether they be monetary or equitable, you have damages that would support a punitive award. The issue about Marchbansky, let me just go back to that, to one second. There is a big difference between challenging the credibility of evidence, because then the jury hears the evidence, as opposed to excluding the evidence in which the jury then does not hear any of the evidence. And they then, they don't sit there and weigh and bounce it off on credibility issues, it's just excluded. And why that's important is that this whole case ultimately comes down to emotional damages. And if the court, and it's not correct, it's just emotional, we ask the court to conduct an evidentiary hearing concerning whether or not this doctor should be able to testify concerning the MMPI on a non-validated population with a non-validated Spanish version of the text. Sotomayor, we made that argument to the jury, though. We made every argument possible to the jury. Well, then, isn't it a question of whether the jury wants to buy your side or the other side? Not, is that an appropriate argument to an appellate tribunal? No, that's not the appropriate argument. There's a difference between challenging and attacking credibility because it still allows the jury to consider, as opposed to excluding it altogether when there is no credibility issue. It's own, the issue is just never before the jury. And that's what district courts' judges are supposed to do. They're supposed to be the gatekeeper. They're the people that says this comes in and then it can be challenged or it doesn't come in and there is no challenges one way or the other. And that's where we're complaining in this case that the judge failed. Thank you very much, Mr. Coffman. Mr. Reyes, thank you as well. The case just argued is submitted. Thank you, Your Honors. Good morning, gentlemen. Good morning, Mr. Coffman.
judges: Thompson, Cowen, Silverman